IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

CURTIS TURNER, individually and as
Superintendent of the Mineral Springs
School District; MINERAL SPRINGS SCHOOL
DISTRICT BOARD OF EDUCATION, a public
body corporate; WILLIAM DIXON, MIKE
ERWIN, JAMIE JACKSON, ZEMERA NEWTON,
RAY HAWKINS, SHEILA JACKSON, and
DOROTHY VAUGHN, all individually and
in their official capacities as members of the
Mineral Springs School District Board of
Education; and MINERAL SPRINGS
SCHOOL DISTRICT                                                          PLAINTIFFS

v.                                 No. 2:16-cv-29-DPM

JOHNNY KEY, individually and as
Commissioner of the Arkansas Department
of Education; ARKANSAS DEPARTMENT
OF EDUCATION, a state agency; BOARD OF
EDUCATION OF THE ARKANSAS
DEPARTMENT OF EDUCATION; JAY BARTH,
JOE BLACK, CHARISSE DEAN, MIREYA
REITH, R. BRETT WILLIAMSON, DIANE
ZOOK, SUSAN CHAMBERS, OUIDA
NEWTON,* and O. FITZGERALD HILL,* all
individually and in their official capacities;
and HEMPSTEAD COUNTY, Arkansas                                           DEFENDANTS

---

\* The State Board has two new members, Ouida Newton and O. Fitzgerald Hill. They're substituted for Toyce Newton and Vickie Saviers, whose terms expired in June 2016. FED. R. CIV. P. 25(d).

## ORDER

**1.** The Mineral Springs School District, its board members, and its superintendent contend that Arkansas—in the persons of commissioner of education Johnny Key and the state board of education—have violated the Fourteenth Amendment. The State Defendants' long-pending motion to dismiss needs deciding. In their briefing, the parties have commendably boiled Mineral Springs's third amended complaint down. There are two live disputes:

- Did the State Defendants encourage (through various particular steps) inter-district segregation in Howard and Hempstead Counties in violation of the Equal Protection Clause?
- Do the transfer limitations in the 2013 and 2015 versions of Arkansas's School Choice Act violate the Equal Protection Clause?

Mineral Springs says it has pleaded plausible claims that both constitutional violations occurred. The State Defendants say that the District has not. As Mineral Springs acknowledges, for one legal reason or another, its other claims fail at the threshold. They'll all be dismissed by agreement. The Court reviews the two remaining claims for plausibility: accepting the facts alleged as true, giving Mineral Springs the benefit of reasonable inferences from those facts, while disregarding conclusions (legal and factual), is it plausible that race partly motivated the State Defendants' actions? *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**2.** The Court takes the second issue first. It does so because the 2013 and 2015 statutory changes to the School Choice Act are among the things that Mineral Springs says show an "evasive scheme" to promote racially segregated school districts in Howard and Hempstead Counties. № 23 at 32. Mineral Springs highlights Ark. Code Ann. § 6-18-1906, which limits student transfers between districts. The 2013 version of this section is in Appendix A; the 2015 version is in Appendix B.

After the parties fully briefed this case, the 91st General Assembly further amended this statute during the 2017 regular session. 2017 Ark. Acts 1066, § 4. There has been no request to amend the complaint again, file supplemental briefs, or otherwise bring the 2017 amendments into this case. So the Court doesn't have the benefit of adversarial argument on the latest changes. The most prudent course, in these circumstances, is to limit this decision to what has been argued. The Court's ruling is therefore without prejudice to any later claim involving the 2017 amendments to Ark. Code Ann. § 6-18-1906.

The *Teague* litigation is the backdrop to this evolving statute. Before that case was filed, the General Assembly considered replacing the race-based limitations on transfers with numerical limitations; and after the Western District of Arkansas held that those race-based limitations were unconstitutional, and tainted the statute beyond repair, the General Assembly repealed and replaced the whole School

Choice Act. *Teague v. Cooper*, 720 F.3d 973, 975–76 (8th Cir. 2013). That development mooted the case. As the Court of Appeals anticipated, the statute has continued to change and come back into court. 720 F.3d at 977–78.

Mineral Springs has failed to make a plausible claim that the 2013 and 2015 versions of School Choice Act offend the Equal Protection Clause. The statute's words are neutral about race. The law has reasons behind it: promoting student transfers between districts, while respecting desegregation obligations about student assignment. Ark. Code Ann. § 6-18-1901(b). The statute limits total transfers by a percentage of district enrollment, rather than by racial criteria, which the now-repealed statute deployed. *Compare* Ark. Code Ann. § 6-18-1906(b), *with* Ark. Code Ann. § 6-18-206(f)(1)(repealed 2013). As the Court of Appeals noted in *dictum* on the way to holding that the Teagues' case was moot, "[b]y rewriting the entire statute and eliminating all explicitly race-based limits on school transfers, the General Assembly evidenced an intent to move away from this constitutionally sensitive issue so as to preserve the benefits of school choice." 720 F.3d at 978.

Mineral Springs acknowledges all this. The District presses its attack on the statute nonetheless, contending that, though rational, the law is defective because one of its purposes was to facilitate re-segregation, which would not be protecting all the students equally,

-4-

contrary to the Constitution's command. *Stevenson v. Blytheville School District #5*, 800 F.3d 955, 972 (8th Cir. 2015); *Friends of Lake View School District Incorporation No. 25 of Phillips County v. Beebe*, 578 F.3d 753, 761 (8th Cir. 2009). This is implausible. Of course the General Assembly was responding to the District Court's invalidation of the former statute in *Teague*. But it's a leap from there to a discriminatory purpose. Mineral Springs's deeper point is that a choice regime that doesn't take race into account makes re-segregative effects likely, a result Arkansas had pointedly acknowledged in defending the former statute during the *Teague* case. This argument, though, runs into settled law: a likely disparate impact doesn't show discriminatory purpose — unless benign purposes don't exist, seem hoked-up, or are mixed with facts showing a bad purpose. *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 264–66 (1977). Mineral Springs says that the General Assembly didn't have to pass any new choice statute, which is a true and revealing point. Arkansas has for some years been pursuing pro-school-choice policies. Commissioner Key has been a leader in this push, as Mineral Springs notes. This legitimate, albeit contested, purpose undoubtedly exists. The 2013 Act reflects that purpose.

What about the 2015 Act? *See* Appendix B. As Mineral Springs points out, among other things, these amendments addressed the desegregation limits on transfers. An annual-exemption procedure,

which had been available to districts, was cut. And districts claiming a conflict between the statute's generally applicable inter-district choice provisions and a desegregation plan or order about student assignment were required to submit proof from a federal court of genuine conflict with an active order or plan. Ark. Code Ann. § 6-18-1906(a). In addition, districts were required to send the Department of Education copies of all desegregation orders. *Ibid.* These are marginal requirements. The conflict provisions had generated disputes, including some litigation. *E.g., Stevenson, supra; Forrest City Special School District v. Palestine-Wheatley School District*, No. 2:14-cv-117-BRW. Though Mineral Springs describes the 2015 changes as narrowing ones, the foundational law remained: a desegregation obligation about student assignments trumped a transfer request that the statute would otherwise allow. Ark. Code Ann. § 6-18-1906(a)(1). The 2015 changes provided clarity; they do not plausibly show discriminatory animus.

In sum, Mineral Springs's stand-alone challenge to the 2013 and 2015 versions of the School Choice Act's transfer limitations fails to state a claim.

**3.** In its other remaining claim, Mineral Springs says that the State Defendants intended to disfavor black students in Howard and Hempstead Counties. That purpose, of course, would offend the Equal Protection Clause. Mineral Springs sees this intention in several particulars: the 2013 and 2015 changes to the School Choice Act; recent

-6-

statutory and regulatory changes to the rules about school district performance; the consolidation of the Mineral Springs and Saratoga school districts; and the lack of comprehensive data gathering and reporting—about the effects of both student transfers and district consolidation on the racial composition of school districts. Again the Court confronts state actions that are racially neutral on the surface, and to go forward in this case Mineral Springs must have other facts from which a racially biased intent may reasonably be inferred. *Village of Arlington Heights*, 429 U.S. at 264–66.

The District does not allege enough of this kind of facts. Its main point is that—post-consolidation and post-transfers—the current districts in these two counties have gotten blacker and whiter. This is a fact, a result, but not one that carries the day on discriminatory intent. Of course the results of official action are relevant in evaluating intentions. *Village of Arlington Heights*, 429 U.S. at 265–66. But this is not the "exceedingly rare case[]" where the effects of neutral state action alone make the claim a solid one. *Friends of Lake View*, 578 F.3d at 762 n.12.

A closer look at the particulars alleged leads the Court to the same place. The 2013 and 2015 post-*Teague* changes to the School Choice Act have already been considered at some length. Mineral Springs, with admirable candor, indicates it would prefer either no path for inter-district transfers, or at least one hedged with race-based limits to

-7-

prevent re-segregation. Understood. Recent precedent, though, makes plain that the latter option would raise constitutional questions. *E.g., Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007). The district court's vacated decision in *Teague*, although not as a matter of precedent for this case, illustrates this reality. *Teague ex rel. T.T. v. Arkansas Board of Education*, 873 F. Supp. 2d 1055 (W.D. Ark. 2012), *vacated sub nom., Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013).

In *Doe v. Arkansas Department of Education*, No. 4:15-cv-623-DPM, this Court addressed in detail the evolving Arkansas law about academic districts, including when the State may step in, all in the context of the Little Rock School District takeover. № 72 at 20–24. In general, the State now expects better student performance and can assert control of troubled districts sooner. This is another instance of the core of Mineral Springs's case: facially neutral law that disproportionately affects minority districts. But that core truth isn't enough to make it plausible that the State Defendants enacted, and are implementing, these rules motivated partly by an intention to harm black students in general or those in Howard or Hempstead Counties in particular. The law presumes good intentions, leavened, of course, with reasonable disputes about the wisdom of the resulting actions.

Mineral Springs has clarified that it has no quarrel with the racially neutral push for fewer school districts reflected in the Public

Education Reorganization Act. Ark. Code Ann. §§ 6-13-1601, *et seq.* The allegation, instead, is that the State Defendants "ignor[ed] the racial safeguard of [this] Act by allowing [the Saratoga and Mineral Springs districts] to consolidate." № 29 at 14. This Act says: "All administrative consolidations or annexations under this section shall be accomplished so as not to create a school district that hampers, delays, or in any manner negatively affects the desegregation of another school district in this state." Ark. Code Ann. § 6-13-1603(c).

This provision seems to be about safeguarding desegregation orders and plans, which aren't alleged to have been in play in Howard County or Hempstead County. All the districts in those counties are, insofar as the record discloses, unitary. Putting that point to one side, the consolidation issue comes down to untoward effects from a comprehensive and neutral statutory scheme, in which Arkansas pursued economies of scale to improve schools, and which was upheld against constitutional attack. *Friends of Lake View*, 578 F.3d at 761–63. Mineral Springs's variation on this theme — violation of a statutory duty to avoid adversely affecting desegregation efforts — is creative. And under *Arlington Heights*, deviations from legal obligations can indicate discriminatory intentions. 429 U.S. at 266–67. But, Mineral Springs's point here is ultimately one of law, not fact, and the Court is unpersuaded that the point survives the *Friends of Lake View* holding. 578 F.3d at 761–63.

Last, data collection and reporting. Mineral Springs's third amended complaint, attachments, and briefing are full of numbers. They're how Mineral Springs has shown with clarity that all the districts in Howard County and Hempstead County are re-segregating. So the data are there. What Mineral Springs alleges, and what the Court assumes to be true, is that the Department of Education hasn't fulfilled its statutory duties to analyze whether transfers are having "a racially segregative impact" on particular districts and to report its findings annually to the General Assembly's education committees. Ark. Code Ann. § 6-18-1907(c)(repealed 2017). This is troubling. While it may be, as the State Defendants say, that these duties are ministerial, with no immediate impact on these districts, the statute wasn't followed. These omissions support a reasonable inference that the State hasn't been as concerned about these issues as Arkansas law required. But these omissions do not salvage the claim. The pro-school-choice agenda is on the march in Arkansas. "As between that obvious alternative explanation for the [State Defendants' omissions] and the purposeful, invidious discrimination [Mineral Springs asks the Court] to infer, discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682 (quotation and citation omitted).

Guided by *Arlington Heights*, the Court has considered the material circumstances, including the history, trying as best it can to discern whether Mineral Springs has plausibly alleged that racial

animus partly motivated the State Defendants' actions and non-actions involving the school districts in Howard and Hempstead Counties. Mineral Springs has pleaded a strong case of re-segregative effects. But, in the Court's judgment, it's implausible on the pleaded facts to conclude that the State Defendants intentionally pursued those effects.

\* \* \*

The motion to dismiss, № 25, is granted, with a carve-out for any future claims about the 2017 amendments.

So Ordered.

*/s/ D.P. Marshall Jr.*
D.P. Marshall Jr.
United States District Judge

28 September 2017

# Appendix A

Ark. Code Ann. § 6-18-1906 (from Act 1227 of 2013)

(a) If the provisions of this subchapter conflict with a provision of an enforceable desegregation court order or a district's court-approved desegregation plan regarding the effects of past racial segregation in student assignment, the provisions of the order or plan shall govern.

(b) (1) A school district annually may declare an exemption under this section if the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation.

    (2) (A) An exemption declared by a board of directors under this subsection is irrevocable for one (1) year from the date the school district notifies the Department of Education of the declaration of exemption.

    (B) After each year of exemption, the board of directors may elect to participate in public school choice under this section if the school district's participation does not conflict with the school district's federal court-ordered desegregation program.

    (3) A school district shall notify the department by April 1 if in the next school year the school district intends to:

        (A) Declare an exemption under this section; or
        (B) Resume participation after a period of exemption.

(c) (1) (A) There is established a numerical net maximum limit on school choice transfers each school year from a school district, less any school choice transfers into the school

district, under this section of not more than three percent (3%) of the school district's three-quarter average daily membership for the immediately preceding school year.

(B) For the purpose of determining the percentage of school choice transfers under this subsection, siblings who are counted in the numerator as transfer students shall count as one (1) student, and siblings who are counted in the denominator as part of the average daily membership shall count as one (1) student.

(2) Annually by June 1, the Department of Education shall report to each school district the net maximum number of school choice transfers for the current school year.

(3) If a student is unable to transfer due to the limits under this subsection, the resident district shall give the student priority for a transfer in the following year in the order that the resident district receives notices of applications under § 6-18-1905, as evidenced by a notation made by the district on the applications indicating date and time of receipt.

## Appendix B

Ark. Code Ann. § 6-18-1906 (from Act 560 of 2015)

(a) (1) If the provisions of this subchapter conflict with a provision of an enforceable desegregation court order or a district's court-approved desegregation plan regarding the effects of past racial segregation in student assignment, the provisions of the order or plan shall govern.

(2) If a school district claims a conflict under subdivision (a)(1) of this section, the school district shall immediately submit proof from a federal court to the Department of Education that the school district has a genuine conflict under an active desegregation order or active court-approved desegregation plan with the interdistrict school choice provisions of this subchapter.

(b) (1) (A) There is established a numerical net maximum limit on school choice transfers each school year from a school district, less any school choice transfers into the school district, under this section of not more than three percent (3%) of the enrollment that exists in the school district as of October 15 of the immediately preceding school year.

(B) For the purpose of determining the percentage of school choice transfers under this subsection, siblings who are counted in the numerator as transfer students shall count as one (1) student.

(C) A student eligible to transfer to a nonresident district under § 6-15-430(c)(1), § 6-18-227, or § 6-21-812 shall not count against the cap of three percent (3%) of the resident or nonresident district.

(2) Annually by December 15, the department shall report to each school district the net maximum number of school choice transfers for the next school year.

(3) If a student is unable to transfer due to the limits under this subsection, the resident district shall give the student priority for a transfer in the first school year in which the district is no longer subject to subdivision § (b)(1) of this section in the order that the resident district receives notice of applications under § 6-18-1905, as evidenced by a notation made by the district on the applications indicating date and time of receipt.